# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 2:07-CR-46 |
| JONATHAN HOGGE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Jonathan Hogge defrauded hundreds of people in an insurance fraud scam. After being charged with an array of crimes, he eventually pled guilty without the benefit of a plea agreement to nine counts of mail fraud, one count of wire fraud, and one count of conspiracy to defraud the United States. The government and Hogge have wildly different views about what Hogge's appropriate sentence should be. According to its sentencing memorandum, the government seeks a sentence of 324 months; Hogge, by contrast, seeks probation. Frankly, both requests are unreasonable.

I held a two-day evidentiary hearing in January to determine the proper computation of Hogge's offense level under the Sentencing Guidelines. Based on the findings I make below, Hogge's total offense level is 33 and he is in criminal history category I. That leads to a sentencing range suggested by the guidelines of 135-168 months. Then, on March 25, 2011, I held the final sentencing hearing where I considered Hogge's request for a sentence below the advisory guideline range pursuant to 18 U.S.C. § 3553(a). As explained on the record at the March 25th hearing and for the reasons detailed below, after taking into account the various sentencing factors enumerated in Section 3553(a), I have concluded that a sentence below the

guidelines is appropriate and sentence Hogge to a term of imprisonment of 84 months.

## BACKGROUND

Hogge founded My Smart Benefits, Inc. in 2000 and served as its co-owner, president, and chief executive officer until it closed its doors on October 23, 2003. My Smart Benefits was a third-party administrator of direct-reimbursement dental plans. Direct-reimbursement dental plans are set up by employers as a dental benefit for their employees. They are funded by the employer (with part of the money being contributed by employees) and do not contain insurance or risk-of-loss components.

My Smart Benefits solicited employers to hire it to set up these dental plans as an employee benefit and to provide for their ongoing administration. The employer would make periodic payments into the plan (typically monthly or quarterly), and My Smart Benefits would take a percentage of each payment as an administrative fee in order to provide claims evaluation, claims processing, and other administrative services. The administrative fee percentage varied depending on the specifics of each contract. In the 63 contracts entered into the record as exhibits (of 1023 total contracts My Smart Benefits secured over its lifetime), the fee percentage ranged from 7% to 22% (though a number of the contracts had no specific percentage at all). The remaining funds contributed by the employers – those left after the administration fee was deducted – were supposed to be placed in segregated individual accounts solely for the payments of any dental claims made by the individual employer and its employees. My Smart Benefits also offered employers stop-loss insurance to protect against catastrophic claims or an unexpectedly high utilization of the dental care plan by employees.

At least, that's all how it was supposed to work. In reality, Hogge flouted many of these

procedures.  First, the funds contributed by employers were not placed in individual, trusted accounts but were instead pooled into a few corporate accounts maintained by My Smart Benefits.  Whether this was by accident or by design, it created accounting chaos.  Hogge maintained total control over these corporate accounts and would routinely transfer funds from these accounts to other general business or personal accounts.  Second, starting at least in 2003, Hogge deducted an administrative fee of 30% from all funds coming into every account, even though he was only supposed to be deducting between 7% and 22% (at least for the contracts that are in the record).  Third, My Smart Benefits accepted over $200,000 in payments for stop-loss insurance from five of the employers, but it never actually purchased that insurance, which left employers and employees at risk for a huge loss if costly and unexpected dental costs arose.

Hogge, who exercised complete control over every aspect of MSB, was at the center of all this fraudulent conduct, and he profited handsomely from it.  The scheme was run similar to Charles Ponzi's infamous and eponymous fraud.  Many of the claims submitted were in fact paid by My Smart Benefits.  But with Hogge exacting a huge and unauthorized administrative fee, the claims could only be paid if the sales end of the business continued to grow the revenue.  As with most schemes like this, Hogge started getting behind in paying claims, complaints were made to the authorities, his bank accounts were ultimately frozen, and the jig was up.  Eventually, Hogge was indicted on 30 counts of fraud, embezzlement, and conspiracy.  He pled guilty to the first 11 counts, without the benefit of a plea agreement, and the Government dismissed the remaining counts of the indictment.

In addition to the criminal case, a civil case was initiated by the Department of Labor based on funds in a My Smart Benefits account that had been seized and frozen once MSB had

been shut down.  Upon the filing of that lawsuit – which was assigned to Judge Rudy Lozano – the parties agreed to appoint an Independent Fiduciary to assess and verify unpaid dental claims that were the result of Hogge's fraud.  (By agreement of the parties, this sentencing was put on hold while the Independent Fiduciary did her work).  On November 22, 2010, Judge Lozano accepted the Independent Fiduciary's assessment that the total unpaid claims amounted to $258,386.59.

## DISCUSSION

The procedure for sentencing criminal defendants changed with the decision in *United States v. Booker*, 543 U.S. 220 (2005).  Now, "[u]nder the post- *Booker* sentencing procedures, a district court is to (1) calculate the applicable Guidelines range; (2) give the defendant an opportunity to identify any of the 18 U.S.C. § 3553(a) factors that might warrant a non-Guidelines sentence; and (3) state which factors influenced the final sentence."  *U.S. v. Curb*, 626 F.3d 921, 926 (7th Cir. 2010).

## I.  Computation of the Total Offense Level

The Pre-Sentence Investigation Report ("PSR") calculated Hogge's total offense level as 37 and his criminal history category to be I, which resulted in a total guideline range of 210-262 months.  Here's how the PSR got to offense level of 37:

```
   7 – base offense level (see U.S.S.G. § 2B1.1)
 +16 – amount of the loss (§ 2B1.1(b)(1)(I))
 + 6 – number of victims (§ 2B1.1(b)(2)(C))
 + 2 – sophisticated means (§ 2B1.1(b)(9)(C))
 + 4 – role in the offense (§ 3B1.1(a))
 + 2 – abuse a position of trust (§ 3B1.3))
 + 2 – obstruction of justice (§ 3C1.1))
 - 2 – acceptance of responsibility (§ 3E1.1(A))
  37 – TOTAL
```

While Hogge and the government have vigorously disputed many aspects of this calculation, both parties now concede that a number of these components are correct and thus no longer in dispute. Here's what the parties agree to: that the base offense level is seven points, that Hogge's role as a leader in the offense adds an additional four points, and that Hogge's abuse of trust adds two more points.

Furthermore, Hogge conceded during the hearing that the sentencing guidelines in place at the time of sentencing (*i.e.*, the 2010 guidelines) apply, rather than those in place at the time of the offense (*i.e.*, the 2002 guidelines). *See* 18 U.S.C. § 3553(a)(4)(A)(ii) (courts are to use the version of the guidelines "in effect on the date the defendant is sentenced."); *United States v. Nurek*, 578 F.3d 618, 625-26 (7th Cir. 2009); *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006). In conceding this point, Hogge recognized that he was incorrect in his earlier argument (made in his sentencing memorandum) that the lower point total under the 2002 guidelines should apply. Hogge also withdrew his argument that he is entitled to subtract three points for his acceptance of responsibility, conceding that a three-point reduction (as opposed to a two-point reduction) is only available when the Government moves for it. *See* U.S.S.G. § 3E1.1(b); *United States v. Deberry*, 576 F.3d 708, 710 (7th Cir. 2009). For its part, the Government conceded at the hearing (contrary to its sentencing memorandum) that Hogge did not obstruct justice, eliminating two points from the PSR's calculation.

All of this leaves four areas of genuine dispute in calculating the total offense level: 1) What is the amount of loss? 2) How many victims were there? 3) Did this offense involve sophisticated means? and 4) Has Hogge accepted responsibility for the commission of this offense?

**A.  The Amount of Loss**

By far the most contentious and difficult issue to untangle is the amount of the loss that was caused by Hogge's fraud.  Section 2B1.1 of the sentencing guidelines provides a framework for calculating the amount of "loss" attributable to a defendant, which is the greater of the "actual loss" or the "intended loss."  U.S.S.G. § 2B1.1, cmt. n.3(A)(i)-(ii).  "Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense.  U.S.S.G. § 2B1.1, cmt. n.3(A)(i). "Intended loss" is "the pecuniary harm that was intended to result from the offense" and includes "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, cmt. n.3(A)(ii).

The PSR did not calculate an "intended loss" figure, and neither the government nor Hogge presented any evidence as to what the intended loss might have been.  Having no evidence in the record about intended loss, I will focus – as the PSR, government, and Hogge each did – on the calculation of actual loss.

Because the amount of the loss increases the offense level, the burden is on the government to prove the amount by a preponderance of the evidence.  *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000).  Unfortunately, this is a burden the government rarely, if ever, met in this case.  To be fair, the calculation of the actual loss here is complex, depending on a number of component parts that are themselves murky and difficult to prove.  But the government only muddled the issue by constantly changing its calculation throughout the process, providing different figures in its objections to the PSR, its sentencing memorandum, and at the sentencing hearing itself.

First, in its objections to the PSR, the government argued the total loss was around $2.6

million. This included seven component parts:

- $964,199.05 in missing trust payments made by employers to My Smart Benefits;

- $822,682.09 in excess administrative fees taken by My Smart Benefits;

- $209,728.50 in premiums paid to My Smart Benefits for stop-loss insurance that was never purchased;

- $41,058.15 in unpaid salary to My Smart Benefits employees;

- $258,386.59 in unpaid claims that were verified by the Independent Fiduciary in the civil case;

- $59,944.81 for losses sustained by five insurance agents in covering claims that should have been covered by My Smart Benefits; and

- $254,425.57 in the total loss indicated in victim-loss statements.

*See* PSR at 41-43.

Yet by the time it had filed its sentencing memorandum just a few weeks later, the government's total loss calculation had jumped to around $3.3 million. This change resulted from two things. First, without any explanation, the government no longer included the $59,944.81 for losses sustained by five insurance agents in covering claims that should have been covered by My Smart Benefits. Second, again without any explanation for the change, the government's calculation of the excess administrative fees charged by My Smart Benefits ballooned from $822,682.09 to $1,602,892.02.

The total loss figure changed once again at the sentencing hearing. Under questioning at the hearing the government conceded that the two biggest portions of its calculation – the $964,195.05 missing trust payments and the $1,602,892.02 in administrative fees – were in fact duplicative. This of course makes sense because the missing money derived from the excess administrative fees that Hogge gouged from his clients. So only the excess administrative fees

should be included in the total loss figure. The government further conceded that the $41,058.15 in unpaid salaries to My Smart Benefits employees should not be included because this loss was a corollary result of the business failing, not a direct result of the fraud.

Thus, all before even evaluating the sufficiency of the evidence presented by the government to prove these various component parts, its total loss figure had swung wildly: its calculation was around $2.6 million in the PSR, which ballooned to around $3.3 million in its sentencing memorandum, and then shrunk to somewhere between $1.4 million and $2.2 million during the sentencing hearing (depending on which of its concessions were to be accepted).

The government's yo-yo approach to proving the amount of the loss became even more unclear when the evidence came rolling in at the evidentiary hearing. For instance, the government based its figure of $964,199.05 in missing employer payments on a spreadsheet of data taken from My Smart Benefits' internal accounting files on October 20, 2003 – just days before the business was shut down. This spreadsheet showed all My Smart Benefits' customers that had a positive account balance as of October 20, 2003. A positive account balance indicated that those funds should have been available to each of those employers in an individual, trusted account. The government took the aggregate of those positive account balances – $964,199.05 – as the total amount of missing employer funds.

But while this analysis seems plausible in the abstract, in actuality the underlying evidence is riddled with problems. First, the data may include some $25,000 worth of double-counted positive balance entries. [*See* DE 221-1 at 4.] Second, the data also listed a number of accounts with *negative* balances. Just as a positive balance indicated that funds should have been available to an employer, a negative balance indicated that an employer owed funds to My

Smart Benefits. So if the government is calculating the sum total of missing funds, shouldn't these negative balances be included and ultimately deducted from the overall total? Hogge certainly thinks so, and he totaled over $341,000 in negative account balances. [*See* DE 221-1 at 4-5.] Yet the government never bothered to address this obvious point.

But the most glaring problem is that none of these account balances – positive, negative, or zero – can be trusted with any degree of certainty. At the start of 2003, My Smart Benefits was using QuickBooks to organize its accounts. Hogge apparently found that QuickBooks was insufficient to handle the business's accounting needs and decided to transition to a different system named Apolline, which was created by one of My Smart Benefits' employees. The transition from QuickBooks to Apolline took place over the course of 2003, but there were still numerous problems with the accounts. So the company hired Korey Bowls, an accountant with experience in forensic accounting, to sort out all the client accounts. Bowls spent about 100 hours conducting a forensic analysis on the accounts before the Department of Labor discovered the fraud and seized all of My Smart Benefits' records. But even though his work was cut short by the government seizure, Bowls was able to conclude that he couldn't accurately rely on any of the numbers in either Apolline or Quickbooks. He credibly testified that the quality of the numbers in both Apolline and Quickbooks was "horrible" and that "nothing was correct" in either system. Bowls was a convincing witness, and in the face of his testimony it is difficult to come to any conclusion other than that the government's figure of $964,199.05 is based on completely unreliable data.

In any event, as stated earlier, none of this really matters because whatever the amount of the missing trust fund payment is, the government conceded that it would be counted in the

portion of the loss dealing with the excess administrative fees. But the government's calculation of the portion of the loss dealing with overcharging for administrative fees also turned out to be based on flawed evidence. The government first stated, with no real explanation or evidence in support, that "698 employers were charged $822,692.09 in excess fees, which MSB never returned." [PSR at 42.] The calculation in the sentencing memorandum changed to $1,602,892.02 and at the sentencing hearing was changed once again, albeit slightly, to $1,602,899.02.[1] The near doubling of this amount from the PSR to the sentencing hearing was the result of the government trying to "simplify" the calculation based solely on the testimony Hogge offered at his plea hearing. Hogge testified that he charged administrative fees of 30% on dental plans that should have just been charged somewhere between 17% and 19%. [DE 222-2 at 55.] So to calculate the total excess fees fraudulently charged, the government took the total amount of all employer contributions made to My Smart Benefits ($13,357,491.86), multiplied that number by 30% and arrived at a total amount taken in the form of administrative fees of $4,007,247.56. It then calculated what Hogge should have received in administrative fees if he has taken an average of just 18% (that percentage being the midpoint between the 17% and 19% that Hogge testified at the plea hearing that he should have charged on each account). That amount was $2,404,348.53 (i.e. 18% of $13,357,491). The government then calculated the difference between those two numbers ($4,007,247.56 - $2,404,348.53) as the total amount of excess fees fraudulently taken by Hogge ($1,602,899.02).

---

[1] To be sure, this change is a small point in itself and may well just be a typo, but it is symptomatic of the larger problem I face here: the government has the burden of proving a reasonable estimate of the loss, but its calculation of the overall loss and its component parts has shifted at every stage of this process.

But there are any number of problems with this method. First, the $13,357,491.86 number the government started with as the total amount of all employer contributions was the amount contributed over the entirety of My Smart Benefits existence, starting in 2000. But the indictment charged that Hogge "began to deduct administrative fees of 30% from every client account" starting "on or about January 1, 2003" [DE 1 at 9], and at the plea hearing Hogge only admitted to collecting the flat 30% fee beginning in 2003 [DE 222-2 at 55]. No evidence was presented at the sentencing hearing that the excess fees were extracted prior to 2003.

Moreover, the service contracts between My Smart Benefits and the employers completely undermined the wisdom of using 18% as an estimate of the fees My Smart Benefits should have been taking. In total there were 1023 employers who signed up with My Smart Benefits, each of which signed (or at least should have signed) a contract establishing My Smart Benefits terms of service. Each of these contracts contains a clause indicating the administrative fee to be taken by My Smart Benefits. But the government only discovered 63 of those contracts, meaning that I have no idea what percentage My Smart Benefits should have been taking from the other 960 employers. Was it 10 percent? 18 percent? 30 percent? I have no idea, and I thus have no reasonable way of calculating what excess fees were taken from each of those 960 employers. Even among the 63 contracts that were discovered, 17 do not state what the administrative fee percentage is to be. In the other 46 contracts, the administrative fee percentage ranges from 7% to 22%. Riddled with all of these problems, I have no confidence that the government's calculation of $1,602,899.02 in excess administrative fees is a reasonable estimate of one of the components of the total loss.

* * *

All of this leaves me in something of a quandary: I can't rely on the government's calculation of the loss; yet, there clearly was a substantial loss here. Hogge has admitted to skimming excess administrative fees. Hogge has admitted to taking money to purchase stop-loss insurance that he then never purchased. Hogge has admitted that individual, trusted accounts were pooled into general accounts that he used personally. Hogge has admitted that hundreds of employee dental claims went unpaid as a result of his fraud. In fact, no one disputes that at least hundreds of thousands of dollars were lost as a result of theses frauds. Figuring out – or at least reasonably estimating – how many hundreds of thousands is the trick.

There are couple things that I can say with a reasonable degree of certainty: First, $206,056.50 is part of the loss amount since Hogge received this amount in premiums from his clients for stop-loss insurance but failed to actually procure the insurance for them. Second, the $59,944.81 in losses sustained by five insurance agents cited by the government in its objections to the presentence report will not be considered. The government did not include this amount in its sentencing memorandum and offered no evidence about it at the sentencing hearing. Third, the $41,058.15 in unpaid salaries to My Smart Benefits employees will also not be considered. The government conceded at the sentencing hearing that this loss was like any other unpaid debt of a failed business.

This leaves three components of the loss to resolve: 1) the excess administrative fees, 2) the unpaid claims verified by the Independent Fiduciary, and 3) the victim-impact statements. As for the first category – the excess administrative fees stolen by Hogge – as I stated earlier I have no confidence in the government's evidence on the amount of excess administrative fees. In the absence of reliable evidence in this area, I will accept the defendant's accounting expert

(Patrick Calhoun) and his estimate that Hogge misappropriated $395,596.35 in excess fees.

Next, the Independent Fiduciary spent years working on the civil case and eventually verified $258,386.59 in unpaid claims that resulted from Hogge's fraud.[2] After funds from the frozen accounts were used to pay the Independent Fiduciary's fees, the remaining funds went to pay the outstanding claims. This left a total shortfall of $114,643.49 in unpaid claims.

Hogge argues that he should be given credit for the amount of the claims that were paid by the Independent Fiduciary from the funds in the frozen accounts. But the $258,386.59 loss in verified unpaid claims cannot be offset by a credit for amounts recovered *after* Hogge's crimes were detected. *See* U.S.S.G. §2B1.1, cmt. n.3(E)(i) (credit against loss is available only for funds returned "before the offense was detected"); *United States v. Brownell*, 495 F.3d 459, 463 (7th Cir. 2007) (in order for there to be a credit "when a loss is partially repaid . . . [t]he defendant must make her repayment before the crime is uncovered"); *United States v. Swanson*, 360 F.3d 1155, 1169 (10th Cir. 2004) ("[T]here is no credit against a loss when payments are made after the detection of the offense."); *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998) (funds recovered from defendant's account after it was frozen were properly not deducted from the total loss amount because "[t]he fact that the victims have been able to

---

[2]Hogge argued in his sentencing memorandum that the amount determined by the Independent Fiduciary is "*res judicata*" on the determination of the amount of loss in this case. *See* DE 221 at 8-10. First, presumably Hogge meant that collateral estoppel applied, not *res judicata*. Second, to the extent that Hogge meant that the Independent Fiduciary's calculation collaterally estopped the government from challenging the total amount of unpaid claims, that argument is moot as I have accepted the Independent Fiduciary's calculation. Lastly, to the extent that Hogge meant that the Independent Fiduciary's calculation collaterally estops the government from challenging the total amount of loss, that argument is denied since the Independent Fiduciary clearly never addressed other components of the total loss, like the stop-loss insurance or the amount of excess administrative fees.

recover part of their loss after the discovery of the fraud does not diminish [defendant's] culpability and responsibility for purposes of sentencing"). The fact that Department of Labor swooped in, acted quickly, froze accounts, and then was able to pay a pro rata portion of the pending claims ought not – and cannot – inure to Hogge's benefit. That would be like giving credit to a defendant who runs a Ponzi scheme for the monies paid out to early investors, which the Guidelines also counsel against. *See* U.S.S.G. §2B1.1, cmt. n.3(F)(iv).[3]

The last component of the total loss is the amount indicated in the victim-impact statements. The government's calculation of the total loss included an aggregated amount of $254,425.57 from various victim-impact statements that were submitted to the government. However, many of the employers that submitted victim impact statements also submitted claims to the Independent Fiduciary. It would therefore be duplicative to include both the victim-impact statements and the Independent Fiduciary's amount. And based on the state of the record it is difficult to determine which victims have already been compensated in the civil case.[4]

---

[3] In the end, this discussion is a bit academic because even if Hogge is correct that the loss amount should be reduced by the amount that was paid to victims by the Independent Fiduciary, it would not move him down to the next guideline level. The total loss – the stop-loss payments, the excess administrative fees, and the verified unpaid claims – would still be in the neighborhood of $680,000, well within the $400,000 - $1,000,000 range under 2B1.1(b)(1)(H) that I am ultimately finding applies.

[4] As I noted at the March 25, 2011 sentencing hearing, however, I have used the victim-impact statements as a guide for imposing the amount of restitution Hogge is required to pay. Hogge objected in his sentencing memorandum to this amount of restitution, arguing instead that it should be based on the amounts that remain unpaid from the Independent Fiduciary's analysis. I reject this position. "Restitution is remedial in nature, and its goal is to restore the victim's loss. . . . [R]estitution is calculated based on the victim's loss, while forfeiture is based on the offender's gain." *United States v. Webber*, 536 F.3d 584, 603-04 (7th Cir. 2008). For purposes of restitution, the amounts listed in the victim-impact statements reflect of "the victim's loss." However, to the extent that any of these victims have already recovered funds from the Independent Fiduciary, they are of course precluded from recovering those amounts a second time in restitution. *See* 18 U.S.C. § 3663(b)(1)(B)(ii) ("The order may require that such

Finally, Hogge also tangentially argued during the sentencing hearing that the capital contributions he made to My Smart Benefits should be included as a deduction in the total loss amount. Hogge argues that he contributed $1,160,429.65 to My Smart Benefits between 1998 and 2005 and that he only withdrew $671,847.43. In the exhibits attached to his sentencing memorandum, Hogge only raised this issue as evidence that he "lost track of the finances of the company." [DE 221-1 at 20.] But at the sentencing hearing Hogge seemed to argue that these contributions should be included in the overall amount of loss. To the extent that this argument was even fully formed, it will not be entertained here. First, according to Hogge, more than $200,000 of these contributions came in 2004 and 2005 – clearly after the fraud had been discovered in October 2003. Moreover, more than $500,000 of these contributions took place in 2003, but there is no indication how much of these took place after the fraud was discovered in October. Also, the amount of funds Hogge calculates as "withdrawn" do not include the yearly salary he took from My Smart Benefits. Thus the overall calculation of these contributions cannot be trusted based on the evidence presented, and there is no reason to think they should be included in the calculation of the amount of loss. Indeed, it is telling that when Hogge offered his calculation of the total loss in the PSR and his sentencing memorandum, he did not bother to include these contributions.

Based on the forgoing analysis, I have concluded that the best estimate of the loss is between $400,000 and $1,000,000, which, under § 2B1.1(b)(1), amounts to a 14-point increase

---

defendant in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense . . . pay an amount equal to the greater of . . . the value of the property on the date of sentencing . . . less the value (as of the date the property is returned) of any part of the property that is returned.")

in the offense level.  This total loss includes three component parts:

- $395,596.35 in excess administrative fees taken by My Smart Benefits;

- $206,056.50 in premiums paid to My Smart Benefits for stop-loss insurance that was never purchased; and

- $258,386.59 in unpaid claims as verified by the Independent Fiduciary in the civil case.

Throughout this process the government reiterated again and again that under the sentencing guidelines I "need only make a reasonable estimate of loss."  This is true, of course.  But it is equally true that the "reasonable estimate" must be based on reliable evidence.  *See United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999) ("The guidelines do not require the government to make a fraud loss determination with precision; the figure need only be a reasonable estimate given the information available to the government.  Upon challenge, however, the government bears the burden of supporting its loss calculation with reliable and specific evidence.").  Unfortunately, the evidence produced by the government was at times contradictory, confusing, and ultimately unpersuasive.  With the exception of the third category, the loss amounts set out above are based largely on what Hogge admitted, rather than on amounts the government attempted to prove.

### B.  The Number of Victims

Hogge and the government dispute the number of victims who suffered a loss as a result of Hogge's fraud.  The relevant commentary to the Guidelines defines a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1 cmt. n.1.

Hogge argues that the number of victims is 118, which is the total number of employers

with unpaid claims that were fully verified and adjudicated by the Independent Fiduciary.[5]  On the other hand, the government argues that, even if we just consider the 118 employers with verified unpaid claims, the actual victims are the individual people who worked for those employers who paid into the plan and had unpaid claims.  The Independent Fiduciary's report shows that the individual participants with unpaid dental claims are well in excess of the 250 threshold established in § 2B1.1(b)(2)(C).  *See* DE 221-8 and 221-9.

The government has the better of this argument.  The commentary to § 2B1.1(b)(2) defines a victim as "*any person* who sustained *any part* of the actual loss . . . ."  U.S.S.G. § 2B1.1 cmt. n.1 (emphasis added).  This language indicates that I should count as a victim every participant with a verified unpaid claim.  Cases in other contexts have found that each individual within an entity – and not just the entity itself – counts as an individual victim for purposes of U.S.S.G. § 2B1.1(b)(2).  *See*, *e.g.*, *United States v. Ellisor*, 522 F.3d 1255, 1275 (11th Cir. 2008) (victims of defendant's fraud were the approximately 2,700 students and parents who each paid $10 per ticket for bus transportation to a fabricated Christmas event and not just the 23 schools that had consolidated the ticket money into group checks); *United States v. Densmore*, No. 06-13078, 2006 WL 3707825, at *5 (11th Cir. Dec. 18, 2006) (in the case of money held jointly by a marital couple, both the husband and wife count as victims under § 2B1.1(b)(2) because each sustains a "part of the actual loss").  *Cf. United States v. Stewart*, 33 F.3d 764, 770 (7th Cir. 1994) (the term "victim" may include those who were not financially harmed).

In sum, the government has demonstrated by a preponderance of the evidence that the

---

[5]Hogge concedes that the total victims should also include the five employers that attempted to purchase stop-loss insurance, but all five of those were among the 118 employers with claims that were fully adjudicated by the Independent Fiduciary.

victims in this case are not just the 118 employers who contracted with My Smart Benefits. The individual employees who had dental work done and had their claims go unpaid are also victims, and there are considerably more than 250 of those people. After all, these are the people who paid into the plans (sometimes with an employer contribution as well). And more to the point, these are the folks who are dealing with the aftermath of unpaid dental bills. Thus, under § 2B1.1(b)(2), a six-level increase applies to the total offense level calculation because there are more than 250 victims.

### C. The Sophistication of the Offense

Under § 2B1.1(b)(9)(C), a two-level increase in the total guideline calculation is required if the offense "involved sophisticated means." The application note to this section defines "sophisticated means" as an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.8(B). The Seventh Circuit finds sophisticated means when the conduct shows "a greater level of planning or concealment" than a typical fraud of its kind, *United States v. Wayland*, 549 F.3d 526, 528-29 (7th Cir. 2008), and has endorsed the Eighth Circuit's view that the two-level enhancement "is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (quoting *United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009); alteration in original).

Hogge argued in his objections to the PSR that the offense "was actually relatively simple. MSB offered stop-loss insurance coverage to employers and then did not provide such coverage." [PSR at 47.] Hogge further argued, copying language from Application Note 8(a), that his fraud did not involve the use of "fictitious entities, corporate shells, or offshore

accounts." [*Id*.] But as the Seventh Circuit has noted, this is hardly "an exhaustive list of conduct required for a finding that a scheme was sophisticated, so the fact that [a defendant] may not have used offshore accounts or fictitious entities is not dispositive." *Knox*, 624 F.3d at 872.

In fact, the Seventh Circuit has found that a variety of different conduct constitutes sophisticated means. In *Knox*, the defendant was found to have used sophisticated means when he deceived real estate buyers into purchasing overpriced properties by making promises he would never keep, lied to the real estate sellers by telling them that he sold the properties for a lower amount than was true, and then tricked mortgage lenders into financing properties at prices far exceeding the real property value by falsifying the prospective buyers' loan applications. The defendant argued this conduct was "simply flipping real estate" and that he had never attempted to conceal his identity or use fake contact information. The Seventh Circuit, however, found that the falsification of documents, the coordination of various moving parts of the scheme, and the ability to fool mortgage lenders indicated the scheme's sophistication. *Id.* at 870-872.

Hogge's scheme involved similar intricacies and forgeries. As the government points out, Hogge admitted at his plea hearing that My Smart Benefits' employees falsified documents to make it look like the stop-loss insurance had actually been procured. [DE 222-2 at 52-54.] My Smart Benefits also obtained a sample copy of a stop-loss policy, altered it, and then provided it to customers and insurance agents in order to (falsely) demonstrate the existence of such policies. [*Id*.] My Smart Benefits also prepared marketing materials falsely representing the existence of these policies. [*Id*.] These action clearly constitute "[c]areful execution and coordination over an extended period." *United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003) (affirming a finding of sophisticated means).

To my mind, Hogge's skimming of excess administrative fees off the top of accounts –

taking 30% instead of the lower, contracted-for rate of between 7% and 22% – might be an

example of a sort of "garden variety" or "typical" fraud.  *See*, *e.g.*, *United States v. Higdon*, 531

F.3d 561, 564 (7th Cir. 2008) (deliberately overbilling Indiana Medicaid was a "garden-variety

overbilling fraud").  But the sort of intent, planing, and execution that accompanied his scheme

to promote stop-loss insurance with forged policies and deliberately false marketing materials is

conduct that displays sophistication.  Of course, as in nearly ever case, "more intricate schemes

can be envisioned."  *United States v. Robinson*, 538 F.3d 605, 608 (7th Cir 2008).  But this is not

the standard for the sophisticated means requirement, which only requires "a greater level of

planning or concealment" than the typical case.  *Wayland*, 549 F.3d at 528-29 (7th Cir. 2008).

That threshold has been met here, and a two-level increase in the total guideline calculation is

warranted.

### D.  Hogge's Level of Acceptance

The final issue is whether Hogge deserves a two-point reduction for accepting

responsibility for his crimes.

The government initially argued in its sentencing memorandum that Hogge was not

entitled to this reduction because Hogge had obstructed justice during the investigation of My

Smart Benefits.  *See United States v. Gonzalez-Mendoza*, 584 F.3d 726, 730-31 (7th Cir. 2009)

("[A] defendant whose sentence was properly enhanced for obstruction of justice is presumed

not to have accepted responsibility.").   At the sentencing hearing, however, the government

conceded that Hogge did not obstruct justice.

Notwithstanding this, the government still argues that Hogge has not demonstrated an

acceptance of responsibility for his fraud.  The government points to statements Hogge made in his line-by-line response to the PSR, attached as an exhibit to his sentencing memorandum, that it believes are inconsistent with the admissions he made at his plea hearing.  For instance, at his plea hearing, Hogge admitted that the individual contributions made by employers were in fact improperly pooled into a few general accounts.  However, in his response to the PSR, Hogge stated:  "The money was never pooled in the sense that its origin and charges against such funds could not be determined.  The funds in trust were easily identifiable."  [DE 222 at 86.]  The government sees this as a sort contradiction that indicates Hogge should receive no credit for his guilty plea.

The government is splitting hairs here.  This and the handful of other purported "inconsistencies" – even if they really could be considered inconsistencies – hardly indicate that Hogge has not accepted responsibility for his actions.  The relevant comment to the "Acceptance of Responsibility" section of the guidelines states:  "Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 . . . will constitute significant evidence of acceptance of responsibility . . . ."   U.S.S.G. § 3E1.1 cmt. n.3.  Hogge has met each of these elements.  The PSR also recommended that Hogge receive the two-point reduction based on his "extraordinary cooperation in the preparation of the presentence report."  [PSR at 52.]

I will therefore include a two-level decrease in the total offense level based on Hogge's acceptance of responsibility.  I will not, however, make it the three-level decrease he requested in his sentencing memorandum.  As Hogge conceded at the sentencing hearing, a three-level

decrease under § 3E1.1(b) is only warranted if the government moves for a third level.  *See* U.S.S.G. § 3E1.1 cmt. n.6 ("[A]n adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing.")  The government has made no such motion, so a three-level decrease is unavailable.

### E.  Computation of Hogge's Total Offence Level and Sentencing Range

Pursuant to the preceding analysis, the total offense level is 33.  This includes a base offense level of 7 and additional points for the amount of the loss (+14), the number of victims (+6), the sophisticated means used in the offense (+2), Hogge's role as the leader of the offense (+4), his abuse of a position of trust (+2), and an adjustment for his acceptance of responsibility (-2).  Hogge has no prior criminal history, which means that under the sentencing guidelines he has no criminal history points.  A total offense level of 33 with no criminal history produces a sentencing range of 135 to 168 months.

## II.  Factors under § 3553(a)

Having calculated the applicable guidelines range, *Booker* now requires that I take into account the factors set forth in § 3553(a), including:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); (2) the kinds of sentences available, § 3553(a)(3); (3) the sentencing range established for the applicable category of offense committed by the applicable category of defendant, § 3553(a)(4); (4) the pertinent Sentencing Commission policy statements, § 3553(a)(5); (5) the need to avoid unwarranted sentencing disparities, § 3553(a)(6); (6) the need to provide restitution to victims, § 3553(a)(7);  and (7) the need for judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence,

protect the public, and effectively provide the defendant with needed educational or vocational training and medical care, § 3553(a)(2).

In the present case, after carefully considering all of the evidence presented and thoroughly reviewing the PSR, I have concluded that a variation from the guideline range is in order, and that a sentence of 84 months in prison is sufficient but not greater than necessary to meet the statutory purposes of sentencing.

To be sure, there are a number of factors that concern me about this case. There can be little doubt that Hogge's widespread fraud – one that directly affected hundreds of working class individuals as Hogge stole their money for his own personal benefit – is quite a serious offense under § 3553(a)(2)(A). Moreover, the case took so long to resolve in part because My Smart Business's financial records were so sloppy and befuddling – a problem that results either from blind incompetence or willful obfuscation and that, either way, lands right at Hogge's feet. I am also unpersuaded that the sentence of the other defendant in this case, Jack Lait, enters into Hogge's sentencing equation. Under § 3553(a)(6), I must avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But Lait and Hogge can hardly be said to have engaged in similar conduct: Hogge was the driving force behind everything that happened at My Smart Benefits and the mastermind of the fraud, while Lait was a salaried employee who took direction from Hogge. I also see no merit to Hogge's argument that the government's conduct in prosecuting this case and in conducting discovery was problematic, and, even if I did agree with Hogge on this point, I see no reason how it would fit into the analysis under § 3553(a).

Ultimately, however, I do find that there are a variety of mitigating factors under §

3553(a).  First and foremost among these factors are the unusual circumstances of Hogge's early life.  Hogge struggled through a rough childhood, never knowing his father and having a strained relationship with his alcoholic mother.  He moved out when he was just 15 and eventually joined the Air Force.  He was stationed in Germany, but, knowing his younger brother Jeffrey remained in extremely difficult living circumstances with their mother, he took an extraordinary and highly commendable step:  he returned to Indiana, navigated the state court system, and legally adopted Jeffrey so that he could take him back to Germany and enroll him in a high school there.  Jeffrey Hogge testified on his brother's behalf and indicated that Hogge's actions, love, and concern changed his entire life.  Before Hogge adopted him, Jeffrey's life was headed down a very difficult path.  But with Hogge's help, Jeffrey graduated high school and then college, got his pilot's license, and is now a captain for United Airlines.  This turn of events sounds so melodramatic that it would feel instantly contrived and exaggerated if you saw it in a movie.  But for it to have actually unfolded in reality speaks volumes about Hogge's history and character under § 3553(a)(1).

Hogge's distinguished military record also counts in favor of his history and character under § 3553(a)(1).  Under the guidelines, Hogge's  military service may be relevant in arriving at an appropriate sentence, *see* U.S.S.G. § 5H1.11, and I do find it somewhat relevant in this case that Hogge honorably served his country in considering his history and characteristics under § 3553(a)(1).

The variety of letters I received in support of Hogge, all of which consistently speak towards his role as a positive figure, also support Hogge's history and characteristics under § 3553(a)(1).  It is true that the Seventh Circuit has downplayed the importance of these sorts of

letters of support in *U.S. v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010). Nevertheless, even as I am cautious not to place too great a weight on letters that come from loved ones, relatives, and friends, these particular letters do offer a positive insight into Hogge's character that underscores the courage he showed in helping his younger brother.

Hogge's acceptance of responsibility also militates in his favor with respect to his character and the risk of repeated offense. Hogge met with the Independent Fiduciary and the probation officer handling his case dozens of times, and both lauded his level of cooperation. Hogge earnestly accepted responsibility for his actions and expressed sincere remorse. Thus, while under the guidelines Hogge is only eligible for a two-point reduction pursuant to § 3E1.1(a), I believe that two levels is insufficient under the circumstances of this case. *United States v. Aljabari,* 626 F.3d 940, 951 (7th Cir. 2010) *("If a district court believes that the Guidelines' downward adjustment for acceptance of responsibility is insufficient . . . it may express this belief by imposing a lower sentence.").*

Finally, I believe that the need to protect the public from further crimes of the defendant under § 3553(a)(2)(C) is slight. Hogge has no criminal history – not so much as a traffic citation. As such, I believe it is unlikely that he posses much risk of re-offending.

Thus, for all the reasons articulated above, I believe that a deviation below the guidelines is warranted.

## CONCLUSION

Arriving at a fair sentence for Jonathan Hogge was a complex task. The guidelines computation was difficult to untangle, and the Section 3553(a) analysis was complicated by the fact that, aside from the crimes he committed that brought him before this court, Hogge has lived

an otherwise exemplary life.   For all the reasons stated above, I have concluded that the applicable guidelines range is 135 to 168 months, and I have further concluded that it is appropriate under Section 3553(a) to deviate from those guidelines and institute a sentence of 84 months.  In doing so, I have taken particular guidance from the Seventh Circuit's recent decision in *U.S. v. Lopez*, No. 10-1470, 2011 WL 744663, at *5 (7th Cir. March 04, 2011):

> In a case like this one, presenting a rather technical and arcane question in applying the Sentencing Guidelines, it is perhaps worth another reminder that the Guidelines are, after all, guidelines. They must be considered seriously and applied carefully. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a). The focus must still be on the nature and circumstances of the offense, the history and characteristics of the offender, and several goals of sentencing. A district court facing a tricky but technical issue under the Guidelines may exercise its discretion under section 3553(a) and may spell out on the record whether and to what extent the resolution of the guideline issue affected the court's final decision on the sentence.

*Id.* (internal citations omitted).

This case undoubtedly presented "tricky but technical issue[s] under the Guidelines," which I believe I have "considered seriously and applied carefully."  But ultimately the sentence I arrived at came only "after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a)" and is a sentence I would have given even if the guidelines were computed differently.

**SO ORDERED.**

**ENTERED**:   March 29, 2010

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT